# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

Nº 11-cv-05542 (JFB) (AKT)

———————————

SILVERMAN NEU, LLP,

Plaintiff,

VERSUS

ADMIRAL INSURANCE COMPANY,

Defendant.

———————————

**MEMORANDUM AND ORDER**
March 28, 2012

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Silverman Neu, LLP ("Silverman"), as successor to Chipetine, Neu & Silverman, LLC ("CNS") ("plaintiff" or "Silverman/CNS"), brings this action against Admiral Insurance Company ("defendant" or "Admiral") seeking a declaratory judgment that Admiral had an obligation to defend Silverman/CNS in an underlying class action lawsuit,[1] instituted by class representatives Andrew Zimmerman and Kelly Zimmerman on behalf of a group of plaintiffs (the "Zimmerman plaintiffs"), who alleged that CNS's clients engaged in fraud and misrepresentation against the Zimmerman plaintiffs ("Underlying Lawsuit" or "Underlying Action"). Plaintiff also moves for reimbursement of defense costs in the event the Court finds that Admiral was obligated to have defended plaintiff in the Underlying Lawsuit against the Zimmerman plaintiffs.

Admiral cross-moves for summary judgment seeking a declaration that (1) New York law should govern the duty to defend analysis; (2) the claims in the Underlying Action, for which plaintiff raises a duty to defend, do not fall within the scope of the Admiral Policy insuring agreement, the latter of which was issued to CNS; (3) even if the claims in the Underlying Lawsuit are within the scope of the Admiral Policy's insuring agreement, they fall under one or more of its exclusions, including the Wrongful Act Exclusion; (4) the claims in the Underlying Action, assuming they are covered under the Admiral Policy's insuring agreement, also fall within the Policy's Financial Institution Exclusion; and (5)

---

[1] The suit is styled *Zimmerman et al v. BDO Seidman, LLP, et al.*, No. 09-cv-30190-MAP, 2010 WL 3928684 (D. Mass. Sept. 30, 2010).

summary judgment in Admiral's favor is warranted.

For the reasons set forth herein, the Court denies Silverman/CNS's declaratory judgment motion in its entirety. The Court grants Admiral's cross-motion for summary judgment, concluding that even if coverage theoretically applies to the Underlying Action's claims, coverage is precluded pursuant to the Wrongful Act Exclusion provision. Given that the Court has determined that Admiral has no duty to defend here, it need not address plaintiff's request for damages arising from the Underlying Lawsuit.

I. BACKGROUND

A. Factual Background

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties' respective Rule 56.1 Statements of Facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Unless otherwise noted, where a party's 56.1 Statement is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.[2]

This case arises out of a class action in which the Zimmerman plaintiffs seek to recover payments made to certain credit counseling companies, including Cambridge Credit Counseling Corp. ("CCCC") and Cambridge/Brighton Budget Planning Corp. ("Cambridge/Brighton") – two of CNS's clients – on grounds that these entities engaged in fraud and misrepresentation that injured these customers. (Def.'s 56.1 Statement ("Def.'s 56.1") ¶¶ 1, 6, 10, 13, 17, 20.) Because details concerning the Underlying Lawsuit are relevant to the current dispute, the Court addresses this action in full.

1. The Lawsuit Stage: The Zimmermans Sue

The Zimmerman plaintiffs filed a complaint (the "Zimmerman Complaint") against BDO Seidman, LLP ("BDO"), CNS, and Kostin, Ruffkess & Company, LLP ("Kostin") (collectively, "defendants") in the United States District Court for the District of Massachusetts. (*Id.* ¶ 4.) This action related to two prior actions. One was filed in the United States District Court for the District of Massachusetts (the "Zimmerman Class Action"), alleging violations of the Credit Repair Reorganization Act, 15 U.S.C. § 1679 *et seq.* ("CROA"); the other case was filed in the Eastern District of New York under a RICO theory of liability (the "Limpert Action"). (*Id.* ¶ 5.) The following facts, upon which the parties rely in their briefings and corresponding submissions, are derived from the Zimmerman Complaint.

The Zimmerman Class Action and the Limpert Action were brought by hundreds of thousands of injured debt management plan customers of, among other entities, CCCC and Cambridge/Brighton. (*Id.* ¶ 6.)[3,4] In the

---

[2] Although the parties' Rule 56.1 Statements contain specific citations to the record, the Court cites to the Rule 56.1 Statements instead of to the underlying citation to the record.

[3] Defendant's 56.1 Statement does not provide details concerning the Limpert Action. Because the details of that action are not relevant to the issues raised in this dispute, the Court similarly does not address it.

[4] Silverman/CNS describes CCCC and Cambridge/Brighton as entities that "provided credit counseling and debt management services to its clients." (Pl.'s Mem. of Law in Supp. of Mot. for Decl. J. ("Pl.'s Decl. J. Mem.") at 3.) Clients that were in debt hired CCCC and Cambridge/Brighton to enter into agreements with those clients' creditors,

Zimmerman Class Action, the Massachusetts district court found in favor of the plaintiffs, entering judgment against CCCC and Cambridge/Brighton for $259,085,983 (*id.* ¶ 7), representing the amount of money that the Zimmerman Class Action plaintiffs had paid to CCCC and Cambridge/Brighton for their debt management services (*id.* ¶ 8). On March 18, 2009, the district court entered a final order in which it established a constructive trust for the full amount of the judgment. (*Id.* ¶ 9.)

The Zimmerman Complaint makes several allegations against CCCC and Cambridge/Brighton, for their allegedly wrongful debt management practices, as well as against CNS, for its alleged role in shielding those entities' actions from, and misrepresenting its practices to, the public. In particular, it alleges that CCCC and Cambridge/Brighton held themselves out as non-profit organizations, even though a large portion of their activities were not in furtherance of a tax exempt purpose, making them for-profit organizations. (*See id.* ¶ 11 (stating that CCCC and Cambridge/Brighton participated in "'widespread abuse of tax exemptions and non-profit status in the credit counseling and debt management industry'" (quoting Affirmation of Brian J. Davis in Supp. of CNS' Mot. for Summ. J. ("Davis Affirmation") Ex. C ¶ 21)); *id.* ¶¶ 12-13.) CNS allegedly was aware of this, as to CCCC, because it audited the company and prepared its IRS Form 990 for the 2003 tax year, and as to Cambridge/Brighton, because it audited the company for the 2004 tax year. (*Id.* ¶ 13; *see also* Def.'s Letter of Feb. 11, 2010 ("Def.'s February 2010 Letter") at 2.) Additionally, the Zimmerman Complaint states that CNS knew that CCCC and Cambridge/Brighton had engaged, or were engaging in, unlawful acts, government lawsuits, and other government investigations prior to preparing the IRS Form 990s. (Def.'s 56.1 ¶ 10; *see also* Def.'s February 2010 Letter at 2.) This knowledge of these entities' wrongful acts and representations is, so the Zimmerman plaintiffs claim, attributable to CNS's access to and familiarity with CCCC and Cambridge/Brighton's business and financials. (Def.'s 56.1 ¶ 13.) Despite such awareness, CNS agreed to audit CCCC and Cambridge/Brighton in 2005, preparing, signing, and filing Form 990 returns with the IRS that misrepresented these entities' services. (*Id.* ¶¶ 11, 13.)

The Zimmerman Complaint sought two forms of recovery from defendants: (1) recovery of the proceeds from the constructive trust (created in the Massachusetts district court action), from which CNS allegedly was paid monies, and which the Zimmerman plaintiffs assert constitute class assets (*id.* ¶ 15);[5] and (2) recovery on account of defendants' violations of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679 *et seq*. (*id.* ¶ 16). It is this latter form of recovery that goes to the heart of this dispute, namely, whether the allegations supporting the CROA claim are covered under the Admiral Policy such that a duty to defend applies.

Shedding additional light on the CROA recovery issue, the Zimmerman Complaint states that CNS violated CROA when it prepared and filed Form 990 returns that both misstated the nature of these entities to the government and created an effective marketing tool for CCCC and Cambridge/Brighton in promoting their alleged credit improvement services to

---

setting up budgeted repayment systems with the creditors of the clients' debt obligations. (*Id.*)

[5] At oral argument, both parties referred to this claim as the "restitution claim." (Oral Arg. July 16, 2012).

3

prospective (and allegedly soon-to-be-defrauded) customers. (*Id.* ¶ 17; *see also* Davis Affirmation Ex. C ¶ 162 (stating that defendants "prepared and filed Forms 990 for CCCC and/or Cambridge/Brighton, which misrepresented the nature of those organizations and which the [ ] [d]efendants used to support their advertising claims and to lure in consumers with promises of credit improvement"); *id.* ¶ 163 (stating that "[d]efendants by filing Forms 990 each made untrue and misleading statements in violation of 15 U.S.C. § 1679b(a)(3)"); *id.* ¶ 164 ("Defendants assisted CCCC and Cambridge/Brighton in materially and willfully, knowingly or recklessly misrepresenting information that credit repair organizations are required by the CROA to disclose to consumers and which was material to the establishment of the credit repair organization's liability to consumers under the CROA."); *id.* ¶ 165 (alleging that defendants participated in acts or practices that constituted or resulted in fraud or deception on persons in connection with the offer or sale of services of a credit repair organization).)

Attaching a concrete number to such allegations, the Zimmerman Complaint states that the Zimmerman plaintiffs seek statutory damages[6] for defendants' preparing and filing of CCCC's and Cambridge/Brighton's Form 990 returns and Cambridge/Brighton's 2004 audit report (because no Form 990 was filed for Cambridge/Brighton in that year), the latter of which set forth the annual fees that consumers paid to CCCC and Cambridge/Brighton. (Def.'s 56.1 ¶ 21; *see also* Davis Affirmation Ex. C ¶ 166.) The amount of recovery sought by plaintiffs against defendants totals $137,528,003.00 (from BDO), $42,776,169.00 (from CNS), and $25,883,026.00 (from Kostin), representing the amounts consumers paid during the years in which defendants prepared and filed a Form 990 for CCCC and Cambridge/Brighton. (Davis Affirmation Ex. C ¶ 166.)

Additionally, the Zimmerman Complaint states that each of the defendants is jointly and severally liable to the Zimmerman plaintiffs for the amount awarded in the Zimmerman Class Action and seeks recovery of the approximately $259,085,983.00 awarded in the Zimmerman Class Action as restitution. (Def.'s 56.1 ¶ 22.)

### 2. The Pre-Lawsuit Period: Admiral Issues a Policy

Sometime prior to the Zimmerman's filing of their legal actions, Admiral issued a

---

[6] The appropriate terminology as to what plaintiffs exactly seek as to the CROA claim is a matter of contention between the parties. Whereas Admiral describes the recovery as damages that are *restitutionary* in nature (*see* Def.'s 56.1 ¶ 16; *see also* Pl.'s Decl. J. Mem. Ex. E, Def.'s Denial Letter of Feb. 11, 2010 at 3; *id.* at 5 ("'Damages' [under the terms of the Admiral Policy] expressly does not include 'amounts the "Insured" is required to pay or return as restitution' or 'judgments or awards arising from acts deemed uninsurable by law.' The relief sought by Plaintiffs from CNS in the Underlying Action falls within one or both of these exceptions to the definition of 'damages' in the Admiral Policy.")), CNS describes them as monetary "*damages* of at least $147,000,000.00 arising from the purported intentional, reckless or negligent actions of CNS" (*see* Pl.'s Decl. J. Mem. at 4; *see also id.* at 11-12 (emphasis added)). That is, CNS contends that the "[p]laintiffs in the underlying lawsuit sought 'damages' from CNS, as that term is defined in the Admiral [P]olicy" (*id.* at 12), which notably defines "damages" as *not* including claims of restitution (*id.* at 11).

For reasons set forth *infra*, the Court need not resolve the issue of which monetary-recovery term is most appropriate because, even if the claims against Silverman/CNS fall within the scope of the Policy's coverage provision, any such coverage (and corresponding duty to defend) is excluded under at least one of the Policy's exclusionary provisions.

Professional Liability Policy (claims-made form) to CNS (the "Admiral Policy" or "Policy"). The Policy bore the number EO000012107-07, and was effective from November 15, 2009 to November 15, 2010, with a retroactive date of November 15, 2004. The Admiral Policy provided coverage limits of $2,000,000 per "claim," and $4,000,000 in the aggregate. Because the scope of the Policy's coverage and the express language of its exclusions are pertinent to this dispute, the Court highlights the relevant provisions. In particular, the Admiral Policy states:

I.    INSURING AGREEMENT

> We will pay on behalf of the "Insured" those amounts in excess of the Deductible stated in the Declarations, if applicable, which you are legally obligated to pay as "damages" for a "claim" first made against you during the "policy period" and reported to us in writing during the "policy period," or an Extended "Claim" Reporting Period, provided that the following additional conditions are met:
>
>     \*    \*    \*
>
> B. the "claim" results from a "professional incident" that takes place during the "policy period" or on or after the "retroactive date" stated in the Declarations;
>
>     \*    \*    \*
>
> We have the right and duty to defend any "claim" or suit against the "insured" seeking "damages" because of a "professional incident," even if any of the allegations of the suit are groundless, false or fraudulent.
>
>     \*    \*    \*
>
> We have no obligation or duty to defend any "claim" or suit for which coverage is excluded hereunder or not otherwise afforded by this policy and we shall not be obligated to pay any "claims expenses" incurred by the "Insured" in the defense of any "claim" or suit not covered by this policy.
>
>     \*    \*    \*

(*Id.* ¶ 24.)

The Policy sets forth the following definitions, relevant to understanding the previously quoted language:

> G. "Damages" means a monetary judgment, award or settlement. However, "damages" does not include:
>
> 1. punitive or exemplary damages or any damages which are a multiple of compensatory damages;
>
> 2. amounts the "Insured" is required to pay or return as restitution;
>
> 3. fines, penalties, sanctions, taxes or fees assessed against any "Insured";
>
> 4. judgments or awards arising from acts deemed uninsurable by law.
>
>     \*    \*    \*
>
> O. "Professional Incident" means a negligent act, error or omission in the rendering of or failure to render "professional services" by you or a person acting under your direction, control or supervision and for whose acts, errors or omissions you are legally liable.

5

  P. "Professional Services" means work performed by you for others involving specialized training, knowledge and skill in the pursuit of the business stated in the Declarations.

    \*   \*   \*

(*Id.* ¶ 25.)

Lastly, the Policy contains the following exclusions that specifically state those instances in which the Policy will not provide coverage, *i.e.*, coverage for such listed incidents is excluded:

  C. any liability based in whole or in part on any knowingly wrongful, dishonest, fraudulent, criminal or malicious act committed by or at the direction of any "Insured" in the course of providing "professional services." This exclusion does not apply to any liability of the "Named Insured" or any "Insured" who did not personally participate or personally commit the knowingly wrongful, dishonest, fraudulent, criminal or malicious act, if coverage would otherwise be afforded for the resulting "damages" by this policy;

  (the "Wrongful Act Exclusion")

    \*   \*   \*

  X. any liability based upon or arising out of any services performed for or on behalf of any financial institution including, but not limited to, any bank, credit union or savings and loan association.

  (the "Financial Institution Exclusion")

(*Id.* ¶ 26.)

### 3. The Pre-Lawsuit Period, Part Two: CNS Seeks Coverage Under the Policy

On approximately January 11, 2010, Admiral received a copy of the lawsuit that had been filed against CNS. (*Id.* ¶ 27.) On January 20, 2010 Admiral sent correspondence to CNS, seeking the following information: "when the Insured first became aware of the underlying class actions, when it first became aware of the constructive trust established as a result of the judgments in the underlying class actions, when it first became aware that the plaintiffs and/or the underlying class action plaintiffs were seeking to recover from the Insured the fees paid to the Insured by the underlying defendants, and when it first became aware of the plaintiffs' and/or the underlying class action plaintiffs' claim that the Insured violated the [CROA]." (Decl. of Justin N. Kinney in Supp. of Admiral Insurance Company's Mot. for Summ. J. ("Kinney Decl.") Ex. A.) Notably, Admiral expressly reserved its right under the Policy to disclaim any coverage to CNS. (*Id.*)

On February 11, 2010, after completion of its investigation, Admiral denied coverage to CNS. (Def.'s 56.1 ¶ 30; *see also* Def.'s Feb. 2010 Letter.) On March 9, 2010, CNS requested that Admiral reconsider its determination. (Def.'s 56.1 ¶ 31.) On approximately March 24, 2010, Admiral again denied coverage to CNS. (*Id.* ¶ 32.) Undeterred, on December 22, 2010, CNS requested that Admiral reexamine its position as to coverage. (*Id.* ¶ 33.) On January 11, 2011, Admiral reaffirmed its denial. (*Id.* ¶ 34.) In each of its letters denying coverage, Admiral requested that CNS provide Admiral with any information that might alter Admiral's coverage position. (*Id.* ¶ 35.) Admiral claims that CNS, to date, has not yet come forward with any such information showing that coverage for the

6

Zimmerman Complaint claims is warranted under the terms of the Policy. (*Id.* ¶ 36.)

B.  Procedural Background

On September 26, 2011, Silverman filed the instant action against Admiral in the Supreme Court of the State of New York for the County of Nassau. Admiral removed the action to this Court on November 10, 2011, and on November 17, 2011, Admiral answered the complaint.

Subsequently, on March 2, 2012, Silverman filed a motion for declaratory judgment. Admiral opposed Silverman's declaratory judgment motion and cross-moved for summary judgment on March 30, 2012. On April 23, 2012, Silverman filed its opposition to Admiral's summary judgment motion, which also included its reply to Admiral's opposition papers. On May 2, 2012, Admiral submitted its reply in support of its cross-motion for summary judgment. Oral argument was held on July 16, 2012.

On July 23, 2012, Silverman/CNS submitted a letter addressing the date when plaintiff first had notice of the Zimmerman plaintiffs' class action, an issue discussed during oral argument and for which the parties were allowed to submit supplemental briefing.[7] The letter represented that Silverman/CNS first had notice as of December 8, 2009, the date upon which service of the Zimmerman Complaint was made, and a date falling approximately three weeks after the start of the Admiral Policy. The letter also addressed whether the Zimmerman plaintiffs' claims in the Underlying Action fell within the scope of the Policy's Wrongful Act and Financial Services exclusions. On August 20, 2012, Admiral submitted its letter in response to Silverman's, stating that "it appears that the claims for which Plaintiff seeks coverage were first made against it within the Admiral Policy period." (Def.'s Aug. 2012 Letter at 1.) Despite this, the letter also asserted that coverage for the Underlying Action remained unavailable because the claims fall within the ambit of at least the Policy's Wrongful Act Exclusion, if not also its Financial Services Exclusion. This matter is fully submitted and the Court has considered all of the party's submissions.

II. STANDARD OF REVIEW

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "bears the burden of showing that he or she is entitled to summary judgment." *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials

---

[7] At oral argument, there was some dispute as to when, in fact, the Zimmerman plaintiffs served the complaint, thereby alerting Silverman/CNS as to the fact that the class action plaintiffs were bringing a claim against it. Following oral arguments, the Court allowed the parties to submit supplemental briefing, in part to clarify whether the claims for which CNS seeks coverage were first made during the Admiral Policy Period (November 15, 2009 through November 15, 2010). In their supplemental letter, Silverman/CNS also addressed whether the Zimmerman plaintiffs' claims fell within either of the Policy's exclusions. (Pl.'s Letter of Jan. 23, 2012 ("Pl.'s Jan. 2012 Letter").)

cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (alteration in original). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 24. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33) (internal quotation mark omitted).

### III. DISCUSSION

#### A. Applicable Law

Under New York law, an insurer has an "'exceedingly broad'" duty to defend the insured. *Auto. Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 137 (2006) (quoting *Cont'l Cas. Co. v. Rapid-Am. Corp.*, 80 N.Y.2d 640, 648 (1993)). The duty to defend is broader than the duty to indemnify. *See Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 310 (1984) ("Where an insurance policy includes the insurer's promise to defend the insured against specified claims as well as to indemnify for actual liability, the insurer's duty to furnish a defense is broader than its obligation to indemnify.").

An insurer's obligation to provide a defense is triggered "whenever the allegations of the complaint 'suggest . . . a reasonable possibility of coverage.'" *Auto. Ins. Co. of Hartford*, 7 N.Y.3d at 137 (quoting *Cont'l Cas. Co.*, 80 N.Y.2d at 648); *see Fitzpatrick v. Am. Honda Motor Co.*, 78 N.Y.2d 61, 65 (1991) ("This Court has repeatedly held that an insurer's duty to defend its insured arises whenever the allegations in a complaint state a cause of action that gives rise to the reasonable possibility of recovery under the policy."). This duty to defend on the insurer's part remains steadfast, unless the insurer can "establish, as a matter of law, that there is no possible factual or legal basis on which the insurer might eventually be obligated to indemnify [the insured] under any provision contained in the policy." *Villa Charlotte*

*Bronte, Inc. v. Commercial Union Ins. Co.*, 64 N.Y.2d 846, 848 (1985). For this reason, an insurer who seeks to be relieved of the duty to defend based on a policy exclusion "bears the heavy burden of demonstrating that the allegations of the complaint cast the pleadings wholly within that exclusion, that the exclusion is subject to no other reasonable interpretation, and that there is no possible factual or legal basis upon which the insurer may eventually be held obligated to indemnify the insured under any policy provision." *Frontier Insulation Contrs. v. Merchs. Mut. Ins. Co.*, 91 N.Y.2d 169, 175 (1997). Further, "[i]f any of the claims against the insured arguably arise from covered events, the insurer is required to defend the entire action." *Id.*

A court reviewing an insurance policy must remain mindful that it is a "contract[] to which the ordinary rules of contractual interpretation apply." *Accessories Biz, Inc. v. Linda & Jay Keane*, *Inc.*, 533 F. Supp. 2d 381, 386 (S.D.N.Y. 2008). New York insurance contracts are construed in light of "common speech." *Ace Wire & Cable Co. v. Aetna Cas. & Sur. Co.*, 60 N.Y.2d 390, 398 (1983). Insurance contracts also must be interpreted "according to the reasonable expectation and purpose of the ordinary businessman when making an ordinary business contract." *GMAC v. Nationwide Ins. Co.*, 4 N.Y.3d 451, 457 (2005) (citations and internal quotation marks omitted). Where there are ambiguous terms in a policy, these "must be construed in favor of the insured and against the insurer." *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007).

### B. Duty to Defend

To resolve the issues presented before the Court, there are two principal questions that must be answered: (1) whether the claims asserted by the Zimmerman plaintiffs in the Underlying Action fall within the scope of the Admiral Policy, or stated differently, does the Admiral Policy provide coverage for the types of claims asserted in the Zimmerman Complaint; and (2) if the Admiral Policy provides coverage for the Zimmerman plaintiffs' claims, are they excluded under any of the Policy's exclusionary provisions, specifically, the Wrongful Act Exclusion or the Financial Services Exclusion? The Court proceeds with the first question.

### 1. Do the Zimmerman Plaintiffs' Claims Fall Within the Scope of the Admiral Policy?

Admiral raises several grounds upon which it argues coverage for plaintiffs' claims cannot stand.

First, Admiral contends that the claims in the Underlying Action do not seek to impose on CNS liability for "damages" as that term is defined under the Admiral Policy. That is, the Policy expressly excludes from its definition of "damages," *inter alia*, "amounts the 'Insured' is required to pay or return as restitution" and "judgments or awards arising from acts deemed uninsurable by law." (Def.'s 56.1 ¶ 25.)[8] For Admiral: no "damages" (as

---

[8] Admiral notes Silverman/CNS's concession that Count One of the Zimmerman Complaint seeks restitution; therefore, at least Count One does not seek "damages" under the definition of the Policy. (Def.'s Mem. of Law in Supp. of Cross-Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Cross-Mot. & Opp'n") at 13 (citing Pl.'s Decl. J. Mem. at 11) (stating that "it is only in Count 1 of the underlying complaint, to impose the constructive trust on CNS, in which the Zimmerman Plaintiffs seek restitution from CNS for the fee payments that were made to CNS by CCCC and [Cambridge/Brighton]").) Thus, the true point of contention here lies with Count Two of the complaint, in which the Zimmerman plaintiffs seek recovery "in the form of payments made by the Plaintiffs to CCCC and CB, which were part of computing damages under CROA." (*Id.* (citing Pl.'s

defined under the Policy's express terms), Decl. J. Mem. at 12).) Silverman/CNS contends that this recovery is solely for damages and is not restitutionary in nature. In support of this argument, Silverman/CNS relies heavily on the fact that Section 1679g of CROA entitles persons injured by a violation of CROA to seek actual damages for such injuries. (Pl.'s Decl. J. Mem. at 12.); *see also* 15 U.S.C. § 1679g (stating that "[a]ny person who fails to comply with any provision of this subchapter with respect to any other person shall be liable to such person" for, *inter alia*, "[t]he greater of . . . the amount of any *actual damage* sustained by such person as a result of such failure; or . . . any amount paid by the person to the credit repair organization" (emphasis added)).) Additionally, Silverman/CNS argues that the damages sought in the Zimmerman Complaint are non-restititutionary in nature because they seek to hold Silverman/CNS jointly and severally liable for the full amount of the judgment against CCCC and Cambridge/Brighton. (*See* Pl. Decl. J. Mem. at 13-14 (citing Davis Affirmation Ex. C ¶ 167).)

Admiral counters that simply because CROA's statutory language permits recovery of actual damages, this does not mean that the Zimmerman plaintiffs in fact sought such damages. (Def.'s Cross-Mot. & Opp'n Mem. at 13.) To the contrary, Admiral argues that the Zimmerman plaintiffs sought to recover amounts that the class action plaintiffs paid to CCCC and Cambridge/Brighton for their services, which are, simply stated, *restitutionary* damages. (*Id.*; *see also* Davis Affirmation Ex. C ¶ 166 ("The Classes' statutory damages are *restitutionary*." (emphasis added)).) Restitutionary damages are explicitly not included in the Policy's definition of "damages."

Moreover, Admiral notes that the fact that Silverman/CNS allegedly could have been held (jointly and severally) liable for the full extent of the class action plaintiffs' payments to CCCC and Cambridge/Brighton does not change the nature of the relief that the Zimmerman plaintiffs actually seek, which is restitutionary. (Def.'s Cross-Mot. & Opp'n at 13; *see also id.* at 14 (citing *J.P. Morgan Sec. Ind. v. Vigilant Ins. Co.*, 936 N.Y.S.2d 102 (1st Dep't 2011)); *id.* (stating that "[i]t . . . makes no difference that the amount sought by the Zimmerman Plaintiffs was not paid to CNS or that it could have been jointly and severally liable for all of it[,] [because] [i]t still constitutes restitution," and therefore, "does not constitute 'damages' and is uninsurable'").)

As stated *supra*, the Court need not resolve the actual nature of damages sought for the reasons set forth *infra*.

no duty (to defend or indemnify). (*See* Def.'s Cross-Mot. & Opp'n at 12-14.)

Second, Admiral asserts that even if the Zimmerman Complaint did seek "damages" within the meaning of the Policy, coverage still would not be available for the class action plaintiffs' claims because these did not arise from a "professional incident." (*Id.* at 14-18.)[9] Again: no coverage (pursuant to

---

[9] Admiral argues that, pursuant to both New York law and the terms of the Admiral Policy, Admiral only has a duty to defend Silverman/CNS if the crux of the Zimmerman Complaint seeks damages on account of a "professional incident." (*See* Def.'s Cross-Mot. & Opp'n at 14-15; Def.'s Reply at 9-13.) Specifically, Admiral directs the Court to prior New York state court decisions in which courts have held that an insured may not, via a "shotgun" or isolated allegation, attempt to create a duty to defend; rather, a court must examine the complaint as a whole, and from this, determine the true nature of the asserted causes of action and whether this falls within a policy's scope of coverage. (Def.'s Cross-Mot. & Opp'n at 15 (citing *Bd. of Educ. v. Cont'l Ins. Co.*, 198 A.D.2d 816, 817 (4th Dep't 1993); *Vill. of Newark v. Pepco Contractors, Inc.*, 99 A.D.2d 661, 662 (4th Dep't 1984)); Def.'s Reply at 11 (citing *Lionel Freedman, Inc. v. Glens Fall Ins. Co.*, 267 N.E.2d 93, 95 (N.Y. 1971)); *see also Parkset Plumbing & Heating Corp. v. Reliance Ins. Co.*, 87 A.D.2d 646, 647 (2d Dep't 1982) (stating that "the determination of the insurer's duty to defend must be drawn from the complaint"). Silverman/CNS's answer to this, in effect, is that so long as a complaint against an insured "asserts *a single allegation* that falls within the policy's coverage, the insurer must defend the entire action, even though the complaint asserts additional claims or alternative theories falling outside the policy's coverage." (Pl.'s Decl. J. Mem. at 6 (citing *Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 98 N.Y.2d 435, 443-45 (2002); *Frontier Insulation Contrs. v. Merchs. Mut. Ins. Co.*, 91 N.Y.2d 169, 175 (1997)).)

Here, Admiral argues that the gravamen of the Zimmerman plaintiffs' allegations is that Silverman/CNS allegedly knowingly and intentionally engaged in fraudulent conduct. (Def.'s Cross-Mot. & Opp'n at 15-16; *see also* Davis Affirmation Ex. C ¶¶ 21, 26, 39, 40, 54, 87, 88, 89, 90, 91, 119, 120, 127, 130, 131, 159, 160, 162, 163, 164, 165 (alleging that CNS knowingly participated in fraudulent conduct).) However, coverage under the

10

the Policy's express terms), no duty (to defend or indemnify).

Third, and the turning point for purposes of the Court's analysis here, Admiral argues that Silverman/CNS has not established that the claims for which it seeks coverage were made against it during the Policy period, defined under the Policy as November 15, 2009 to November 15, 2010. (Def.'s Cross-Mot. & Opp'n at 18-19.) Specifically, Admiral argues that the Zimmerman Complaint is dated November 9, 2009 (falling outside the Policy period), and that the summons was issued on November 10, 2009 (also falling outside the Policy period). (*Id.* at 19.) Additionally, Admiral argues that even if service of the complaint were made after November 15, 2009 (*i.e.*, during the Policy period) – a fact that was confirmed post-oral argument – the uncontroverted evidence in the record does not establish that the Zimmerman plaintiffs' claims were not made against Silverman/CNS, or that Silverman/CNS did not have notice of these claims, before service of the Zimmerman Complaint took place.

As to this third issue, the answer is clear: Silverman/CNS confirmed that service of the Zimmerman Complaint was made on December 8, 2009, approximately three weeks after the effective start date of the Admiral Policy. (*See* Pl.'s Letter of July 23, 2012 at 1 ("Pl.'s July 2012 Letter") citing Aff. of Jerrold Silverman ("Silverman Aff.") Ex. A.) Moreover, Admiral no longer disputes that "the claims for which Plaintiff seeks coverage were first made against it within the Admiral Policy period." (Def.'s Aug. 2012 Letter at 1.) Because the Court concludes that the Zimmerman Complaint's allegations, at the very least, fall within the coverage period of the Admiral Policy, it assumes *arguendo* that they are covered under the Policy.

However, the fact that the Zimmerman plaintiffs' claims fall within the coverage *period* of the Policy does not, in and of itself, equate to *coverage* under the Policy. Indeed, this service-during-the-Policy-period point is not a life raft upon which Silverman/CNS's coverage position may stay afloat for very long. This is so because even assuming *arguendo* that coverage may extend to the claims at issue under the plain

---

Admiral Policy (and accordingly, Admiral's duty to defend) only applies to claims arising out of a "professional incident" (Def.'s 56.1 ¶ 24), defined under the Policy as "a *negligent* act, error or omission in the rendering of or failure to render 'professional services'" (*id.* ¶ 25 (emphasis added)). Because the majority of the Zimmerman plaintiffs' claims are premised on fraudulent acts, and because coverage under the Policy only extends to "professional incidents" (defined as negligent acts), Admiral argues that the Zimmerman plaintiffs' isolated, "shotgun" allegation of negligence is not sufficient to trigger coverage. (Def.'s Cross-Mot. & Opp'n at 14-18; *id.* at 17 ("The allegation in Paragraph 54 of the Complaint that CNS 'knew or should have gained knowledge of the [IRS issued audit report]' does not change [the fact that the crux of the claims against CNS are that CNS knowingly misrepresented CCCC and Cambridge/Brighton's services and not-for-profit status] and is insufficient to trigger a duty to defend under the Admiral Policy given the gravamen of the Zimmerman Complaint." (first alteration in original)); Def.'s Reply at 9 (stating neither Paragraph 54 nor Paragraph 122 of the Zimmerman Complaint "changes the gravamen of the Zimmerman Complaint from one alleging intentional and/or fraudulent conduct to one alleging negligence"); *id.* at 9-10 (noting that Paragraphs 54 and 122 are the only two paragraphs in a 170 paragraph complaint arguably touching upon negligence); *id.* at 10 ("CNS incorrectly asserts that paragraphs 54 and 122 allege that CNS knew or should have known that the IRS forms filed by it were not accurate. . . . Neither paragraph says anything about the IRS forms filed by CNS; as noted, paragraph 54 concerns CNS's alleged knowledge of an IRS audit report and paragraph 122 concerns CNS's alleged knowledge of the focus of credit counselors' efforts").)

For the reasons stated *infra*, the Court need not resolve the issue of whether the claims here arose from a "professional incident," because even if they did, coverage is excluded under the terms of the Policy.

11

terms of the Policy's coverage provision, this is not the only section of the Policy that is at issue. Other sections also implicate the extent and scope of the Policy's coverage. *See United Nat. Ins. Co. v. Horning, Ltd.*, 882 F. Supp. 310, 312-13 (W.D.N.Y. 1995) (noting "[t]he determination of an insurer's duty to defend requires the court to compare the allegations in the complaint to the provisions of the insurance contract," and that "[t]he question then becomes whether the allegations are covered by one of the exclusionary provisions of the contract, thus relieving [an insurer] of its duty to defend"); *see also Orange Motor Co. v. Hanover Ins. Co.*, 568 N.Y.S.2d 194, 195 (3d Dep't 1991) (stating "[t]he language of [the policy] is clear and unambiguous and, as such, requires only a comparison of the allegations of the complaint with the language of the exclusionary clauses of the policy," and noting that "the duty to defend is . . . measured by the allegations contained in the pleadings"). Of particular import here are the Policy's exclusionary provisions which, true to their name, explicitly exclude coverage where certain circumstances are met. Here, because the Underlying Action's claims fall within the ambit of at least one of the Admiral Policy's exclusion provisions, any possible coverage under the Policy is, in effect, precluded for the reasons set forth *infra*.

### 2. If There Is Coverage, Does an Exclusion Apply?

The Admiral Policy contains various exclusion provisions. The parties ask the Court to focus its judicial inquiry upon two. These are the Wrongful Act Exclusion and the Financial Institution Exclusion.

The Wrongful Act Exclusion precludes coverage for "any liability *based in whole or in part* on any knowingly wrongful, dishonest, fraudulent, criminal or malicious act committed by or at the direction of any 'Insured' in the course of providing 'professional services.'" (Davis Affirmation Ex. D, Section IV, Exclusions.) Stated differently, where an insured seeks coverage under the Policy, if that insured's claims sound "in whole or in part" in fraudulent conduct, coverage is excluded under the Policy. This language makes sense, as New York courts have a strong public policy against insuring a party from its intentional and/or fraudulent acts, practices, or conduct. *See, e.g., Drexel Burnham Lambert Grp., Inc. v. Vigilant Ins. Co.*, 595 N.Y.S.2d 999, 1010 (N.Y. Sup. Ct. 1993) (noting that "generally, punitive damages are not covered by insurance" and that "[t]he sting of criminal penalties is not to be soothed by permitting its payment out of an insurance pool rather than directly by the wrongdoer"); *id.* (stating that "'no one shall be permitted to profit by his own fraud, or to take advantage of his own wrong'" (quoting *Riggs v. Palmer*, 115 N.Y. 506, 511 (1889))); *Hartford Acc. & Indem. Co. v. Vill. Of Hempstead*, 48 N.Y.2d 218, 227-28 (1979) (stating that "to allow insurance coverage [for intentional acts, which represent a "conscious disregard of the rights of others"] is totally to defeat the purpose of punitive damages"); *Padavan v. Clemente*, 43 A.D.2d 729, 730 (2d Dep't 1973) ("Since punitive damages in New York are awarded as punishment against a defendant and as a warning to others, it is self-evident that it would defeat New York's expressed public policy to permit an insured to avoid the effect of the imposition of punitive damages by passing the burden of payment on to an insurance company.").

It is undisputed that the Zimmerman Complaint contains allegations of knowing and intentional wrongful conduct. (*See* Oral Arg. July 16, 2012 (where, in response to the question, "don't the four corners of the [Zimmerman Complaint] allege fraud, in

12

part?", counsel for Silverman/CNS responded, "They do. Clearly, they do."); Kinney Decl. Ex. F. at 19 (stating that "[t]he fact that the allegations against CNS concern events after 2003 does not alter this calculus, as *Plaintiffs make the conclusory (and baseless) allegation that CNS assisted in continuing the earlier fraud*" (emphasis added)); Pl.'s Decl. J. Mem. at 14 (stating "that *not all* of the allegations against CNS are based upon knowingly wrongful, dishonest, fraudulent, criminal or malicious acts" (emphasis added) (internal quotation marks omitted)); *see also* Pl.'s July 2012 Letter at 2 (stating "the Class-Action attorneys painted a picture that the accountants were co-conspirators with the . . . companies, to somehow *intentionally defraud* the public," and admitting that if the Zimmerman Complaint alleges "purely intentional acts, then . . . there would be no coverage"); *id.* ("[I]f the Complaint sounds solely in fraud and intentional acts [ ] there would have been no basis for coverage.).)

Silverman/CNS's counterarguments are unavailing.[10] Plaintiff's only opposition to the fact that the Wrongful Act Exclusion precludes coverage for claims "based in whole or in part" on fraud is that the Court should liberally construe the allegations in the Zimmerman Complaint, and if there is so much as a scintilla of language in the allegations that brings the claims within the scope of the Policy (that is, if there is any allegation asserting negligence), coverage applies. (Pl.'s Decl. J. Mem. at 8 (stating if "there is any iota of language in a Complaint that brings it within the policy – there is coverage"); *see also* Pl.'s July 2012 Letter at 2 (stating that "if the Court finds any inkling of negligence in the Complaint, then a defense must be provided").) This argument misses the mark. It also suggests an improper reading of an insurance policy.[11,12]

---

[10] The Court notes that Silverman/CNS did not, in fact, address Admiral's arguments in favor of the Wrongful Act Exclusion's applicability in its opposition papers. Thus, any counterarguments are derived from plaintiff's declaratory judgment motion, oral argument, and other documentation submitted during this dispute.

[11] Plaintiff's position was restated at oral argument when questioning plaintiff's counsel concerning its position on the Policy's coverage provision versus its exclusionary provisions:

> Q: For exclusion . . . I think the law in New York for certain is that you look at the complaint for purposes of the application of the exclusion, and when you do that here, . . . there are aspects of fraud in the complaint, even though you are arguing for negligence, and they're saying . . . if there is fraud in the complaint, the exclusion applies. What is your response to that?
>
> A: . . . If there is any mention of negligence in the case, any possible mention of negligence in the case precludes finding that it falls outside the exclusion.

(Oral Arg. July 16, 2012.)

[12] Indeed, even if there are allegations in the Zimmerman Complaint that arguably state a negligence claim, this only answers the first question of our analysis, *i.e.*, whether coverage is triggered under the Policy; it does not answer whether coverage still applies after consideration of any of the Policy's exclusionary provisions. Both questions must be considered and answered before coverage may affirmatively be said to exist. *See Horning*, 882 F. Supp. at 312-13 (stating that "[t]he determination of an insurer's duty to defend requires the court to compare the allegations in the complaint to the provisions of the insurance contract," and that "[t]he question then becomes whether the allegations are covered by one of the exclusionary provisions of the contract, thus relieving [an insurer] of its duty to defend"); *Orange Motor Co.*, 568 N.Y.S.2d at 195 (noting that in determining an insurer's duty to defend, a court must examine "the allegations contained in the pleadings" and compare "the allegations of the complaint with the language of the exclusionary clauses of the policy").

13

In essence, Silverman/CNS asks the Court to put the cart (here, the exclusionary provision) before the horse (the coverage provision). That is, if a claim reasonably falls within a policy's coverage provision, Silverman/CNS suggest that an insurer need read no further: it is bound. Continuing the logical implications of Silverman/CNS's argument a step further, if an insurer examines other provisions of an insurance policy that address the existence and/or scope of coverage, these are not outcome determinative; the only issue is whether the claims fall under the policy's coverage provision in the first place. Any restrictions or limitations on coverage – even if they potentially or actually affect coverage – do not change an insurer's obligations.

The Court disagrees with that argument. Provisions clarifying the extent and scope of coverage are present in an insurance policy for a reason: they explain those instances in which there is coverage and in which there is not. The argument that coverage applies *if one does not consider other provisions of the policy*, or that a provision *with the specific purpose of narrowing the breadth of a broader one* holds no actual restrictive power, is without merit.

It is true that if a complaint's claims fall within the scope of an insurance policy's coverage provisions, coverage is, at the very least, triggered, and vice-versa. *Atl. Mut. Ins. Co. v. Terk Tech. Corp.*, 763 N.Y.S.2d 56, 61-62 (1st Dep't 2003) ("An insurer's duty to defend is triggered whenever allegations set forth in a complaint state a cause of action that gives rise to a reasonable possibility of recovery under the policy. . . . Conversely, if the allegations . . . allow for no interpretation which brings them within the policy provisions, then no duty to defend exists."). However, the coverage analysis does not end there. An insurance policy's print typically goes on, marking different paths pursuant to which the general scope of coverage may or may not remain applicable to certain types of claims. Again, Silverman/CNS asserts that the Court need not proceed upon these paths once it finds at least an "inkling" of negligence in the complaint, as this would signify that coverage reasonably may apply under the Policy's clear terms. However, Silverman/CNS overlooks the broader means pursuant to which an insurer determines insurance coverage. This analysis generally does not begin and end solely at a policy's coverage provision.

For instance, if a policy contains exclusionary provisions – marking those instances in which an insurer will not provide coverage – these must be taken into account, regardless of whether there initially (and reasonably) appears to be coverage under its terms. Where "an insurer asserts that coverage should be denied based on an exclusion clause, 'the burden rests upon the insurance company to demonstrate that the allegations of the complaint can be interpreted only to exclude coverage.'" *Bridge Metal Inds., L.L.C. v. Travelers Indem. Co.*, 812 F. Supp. 2d 527, 542 (S.D.N.Y. 2011) (quoting *Atl. Mut.*, 763 N.Y.S.2d at 62); *see also Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 615 (2d Cir. 2001) ("'If the insurer is to be relieved of a duty to defend, it must demonstrate that the allegations of an underlying complaint place that pleading solely and entirely within the exclusions of the policy and that the allegations are subject to no other interpretation.'" (alteration omitted) (quoting *Hanover Ins. Co. v. Cowan*, 568 N.Y.S.2d 115, 116 (2d Dep't 1991))). This is precisely what Admiral has done here.

Specifically, Admiral has asserted that, regardless of whether the claims in the Underlying Action fall within the scope of

the Policy's coverage provision, they also fall within the ambit of the Wrongful Act Exclusion. Therefore, coverage is excluded.

To satisfy this burden, Admiral points to the clear language of the Wrongful Act Exclusion, which explicitly states that the Admiral Policy does not apply to "any liability *based in whole or in part on any knowingly wrongful, dishonest, fraudulent, criminal or malicious act* committed by or at the direction of any 'Insured' in the course of providing 'professional services.'" (Davis Affirmation Ex. D, Section IV, Exclusions.)[13] There is no dispute here that Silverman/CNS is the "Insured" under the Policy, nor is there any dispute that it engaged "in whole or in part" in fraudulent activity. (*See* Oral Arg. July 16, 2012; *see also* Pl.'s July 2012 Letter at 2; Kinney Decl. Ex. F. at 19; Pl.'s Decl. J. Mem. at 14). Indeed, regarding this last point, a review of the Zimmerman Complaint shows numerous allegations asserting that CNS (among others) performed acts that constituted or resulted in the commission of, or attempts to commit, fraudulent or deceptive practices on consumers, or made untrue and misleading statements, or included knowingly false statements, in the IRS Form 990 returns that it prepared. (*See* Davis Affirmation Ex. C ¶¶ 21, 26, 39, 40, 54, 87, 88, 89, 90, 91, 119, 120, 127, 130, 131, 159, 160, 162, 163, 164, 165.)

Moreover, in its declaratory judgment motion, Silverman/CNS argues that "it is evident that *not all of the allegations* against CNS are based upon 'knowingly wrongful, dishonest, fraudulent, criminal or malicious acts.'" (Pl.'s Decl. J. Mem. at 14.) However, this statement, in effect, concedes that at least *some* of the allegations in the Zimmerman Complaint *are* based upon such conduct. Under the Policy's plain language, if liability is "based in whole *or in part* on any knowingly wrongful, dishonest, fraudulent, criminal or malicious act committed by or at the direction of any 'Insured,'" regardless of whether there also are allegations of negligence, coverage is precluded.

New York courts, under analogous circumstances, have repeatedly reached the same conclusion as this Court on this precise issue. *See, e.g.*, *Bd. of Educ.*, 198 A.D.2d at 817 (allegations that an insured "knew or should have known" of the allegedly wrongful conduct "do not change the gravamen of the complaint from one alleging intentional acts . . . to one involving negligent conduct"); *Orange Motor Co.*, 568 N.Y.S.2d at 195 (court held, in case involving insurance policy that afforded coverage for negligent failure to comply with a motor vehicle statute, that where an insurance policy's exclusionary provision expressly stated that coverage would not apply to an insured's fraudulent conduct, and where at least two counts of the complaint asserted fraud, "the allegations of the complaint . . . [fell] within the exclusionary provisions," relieving the insured of any obligation to defend plaintiff); *Parkset Plumbing*, 87 A.D.2d at 647 (stating that "the mere use of the word 'negligent' alone cannot turn [a] complaint into a cause of action for negligence," and holding that because the overall complaint in that action clearly sounded in contract, which falls "directly within the exclusions of the policies[,] [] the defendant insurers are not required to defend"); *Advanced Refrigeration & Appliance Co. v. Ins. Co. of N. Am.*, 42 A.D.2d 484, 487 (3d Dep't 1973) (court held that an insurer had no duty to defend where court "fail[ed] to see . . . how

---

[13] Although not discussed in great detail by the parties, it is clear that Silverman/CNS's acts of assisting in the auditing and preparation of debt management companies' tax returns meet the Policy's definition of "professional services" as set forth *supra*.

the use of the 'negligence' label can alter the fact that there was no allegation of damage to other property," the latter of which was necessary to a finding of coverage where insurance policy contained various exclusionary provisions stating that coverage would not apply if a malfunction in a product sold by an insured caused no damage to other property); *Lionel Freedman*, 27 N.Y.2d at 369 (court rejected notion that a "shot-gun" allegation of negligence "create[d] a duty to defend," as doing so would go "far beyond that which [an insurer] could have anticipated when it issued the policy").

Thus, Admiral has shown that the Wrongful Act "exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Sea Ins. Co. v. Westchester Fire Ins. Co.*, 51 F.3d 22, 26 (2d Cir. 1995) (citation and internal quotation marks omitted). It likewise has established that "the allegations of [the] underlying complaint place [the Zimmerman plaintiffs'] pleading[s] solely and entirely within the exclusions of the policy and that the allegations are subject to no other interpretation." *Hugo Boss*, 252 F.3d at 615. Accordingly, Admiral has met its burden. Therefore, under the express terms of the Policy, coverage for the Zimmerman plaintiffs' claims, which sound "in whole or in part" in intentionally wrongful or fraudulent conduct, is precluded pursuant to the Wrongful Act Exclusion.

As the Court has determined that coverage is not available under the Admiral Policy due to the Wrongful Act Exclusion, it need not address whether coverage also is precluded under the Financial Institution Exclusion.

IV. CONCLUSION

For the foregoing reasons, the Court denies Silverman/CNS's motion for declaratory judgment, seeking a declaration that Admiral was obligated to defend and provide coverage for plaintiff in the Underlying Lawsuit. It grants Admiral's cross-motion for summary judgment to the extent that the claims in the Underlying Action fall entirely within the Wrongful Act Exclusion of the Admiral Policy, thereby precluding coverage. In light of the Court's determination that Admiral has no duty to defend here, it does not address Silverman/CNS's request for damages arising from the Underlying Lawsuit because it is moot. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 28, 2013
      Central Islip, NY

\* \* \*

Silverman Neu, LLP is represented by Brian J. Davis, Law Office of Brian J. Davis, 400 Garden City Plaza, Suite 450, Garden City, NY 11530. Admiral Insurance Company is represented by Justin N. Kinney, Coughlin Duffy LLP, Wall Street Plaza, 88 Pine Street, 5th Floor, New York, NY 10005.